MOODY'S INVESTORS SERVICE, INC., Plaintiff-Appellee, *v.* THE DE-PARTMENT OF REVENUE *et al.*, Defendants-Appellants.

Fourth District   No. 4—82—0170

Opinion filed February 17, 1983.

Tyrone C. Fahner, Attorney General, of Springfield (Georgene M. Wilson, Assistant Attorney General, of counsel), for appellants.

Richard C. Godfrey, Michael R. Levinson, and James R. Browne, all of Kirkland & Ellis, of Chicago, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

The defendants (Department) appeal from an order of the circuit court of Sangamon County, sitting in administrative review, which reversed a determination by the Department that the sales of plaintiff's (Moody) publications were subject to taxation pursuant to the provisions of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 440 *et seq.*) (ROTA) and the Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.1 *et seq.*).

Before considering the merits of the appeal, we must first thread our way through an extremely convoluted procedural maze. The root of the procedural problem lies principally with the enactment during the pendency of these proceedings of a statute (Ill. Rev. Stat. 1979, ch. 127, par. 39b20) which authorized the appointment of a board of appeals (Board) by the Department.

Moody sells publications containing financial information to subscribers within the State of Illinois. Eight of these publications are concerned here. A brief description of each follows.

1. *News Reports* and *Manuals*: the *Reports* are issued twice a week and give current comprehensive financial information on specific commercial or governmental enterprises in six areas: Municipal and Government, Bank and Finance, Industrial, OTC Industrial, Public Utilities, and Transportation. The *Reports* are compiled into the *Manuals* each year and are supplementary to the *Manuals* which are revised annually. Old *Manuals* are generally discarded. For the purpose of the instant proceedings the Department treated the *News Reports* and *Manuals* as a single publication. The *News Reports* come in loose-leaf form, while the *Manuals* are hardbound, and together they account for about 55 percent of the sales involved.

2. *Bond Survey*: this is published weekly and is of primary interest to brokers, bond dealers and bankers. It breaks down the bond market into seven sectors and the current status of each sector is analyzed with Moody's recommendations on each.

3. *Stock Survey*: this is also published weekly and contains articles about the stock market, the economy, events in Washington, the international situation, business changes, and industrial and corporate developments. It also includes specific buy-hold-sell recommendations and investment policy suggestions, together with charts, tables, and statistical comparisons. This publication and the *Bond Survey* account for about 15 percent of involved sales.

4. *Handbook of Common Stocks*: this is soft-bound and is published every three months. It contains a brief description of 850 common stocks and background information on over 2,500 stocks. Each new issue supplants the prior one. It accounts for about 7 percent of involved sales.

5. *Dividend Record*: this is published twice a week and shows the dividends of approximately 6,000 companies. It is cumulative and used for a full year. It accounts for approximately four percent of the sales.

6. *Bond Record*: this is published monthly and contains data on over 19,000 bonds. Much of the information is subject to change and is constantly updated. The prior issue becomes obsolete upon issuance of the current issue. It accounts for approximately three percent of involved sales.

7. *Municipal Credit Reports*: this is published irregularly and entitles the subscriber to receive credit reports on newly issued bonds or on bonds which receive a revised Moody's rating. A description of the bonds is offered together with an opinion on the issue.

8. *Commercial Paper Reports*: this also is published irregularly and entitles the subscriber to reports on commercial paper of the same nature as municipal bonds. This publication and *Municipal Credit Reports* account for less than one percent of involved sales.

The remaining sales, approximately 15% of the total, are represented by combined subscriptions to the *Stock Survey* and the *Bond Survey*.

The Department commenced an audit of Moody's sales of the publications for the period July 1, 1970, through March 31, 1974. This culminated in the issuance by the Department on June 26, 1974, of a notice of tax liability (NTL) of $36,192.72 in delinquent taxes, $7,238.54 in penalties, and $9,048.27 in interest. Within 20 days as provided in section 6b of ROTA (Ill. Rev. Stat. 1979, ch. 120, par. 445b) Moody protested the NTL and requested a hearing. This hearing was held on Feb-

ruary 6, 1975. Moody claimed at that hearing, and has claimed throughout all these proceedings, that it is exempt under the "newspaper" provision of section 1 of ROTA. Ill. Rev. Stat. 1979, ch. 120, par. 440.

The hearing referee recommended that the NTL be made final as issued with interest computed to May 31, 1975. Moody requested a rehearing and deposited $14,200 with the Department. This is referred to in the record as a "good faith" deposit. Rehearings spanned the period from February 24, 1976, until August 17, 1977, at which time they were concluded. A "Revised Final Assessment" was issued as a result of the rehearings. It did not materially alter the original; it indicated $767.23 less in delinquent taxes and $153.45 less in penalties; interest was computed through February 28, 1979. The record does not disclose the reason for the long lapse of time between the conclusion of the rehearings on August 17, 1977, and the revision approved March 16, 1979.

Moody apparently then requested another rehearing on the revised final assessment of March 1979. The record indicates that such rehearing was concluded on October 18, 1979, with no alterations of the revised final assessment except to calculate interest through December 31, 1979. The Department participated in both the rehearings of 1977 and 1979. Meanwhile, the Department processed the $14,200 good faith payment made by Moody and described above, together with another payment of $28,225 made on July 1, 1979. The total liability after the 1979 rehearings was alleged to be $72,700.20 with interest accumulating from January 1, 1980. Moody was served with this assessment on February 12, 1980.

Within the time limited by ROTA in March 1980, Moody filed a complaint for administrative review in the circuit court of Sangamon County under local number 80-L-108. On July 31, 1980, Moody sought and was granted a voluntary dismissal of this action under section 52 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 52).

The parties have been at great odds over suit number 80-L-108. Earlier in this proceeding the Department sought to supplement the record in this appeal with the proceedings in 80-L-108. This court denied the motion. The Department again sought to supplement the record with only a portion of the proceedings in 80-L-108. That motion was taken with the case and it is now denied.

The controversy stems from a divergence of views as to the reason for the voluntary dismissal. The Department has claimed that Moody failed to file a bond as required by section 12 of the ROTA (Ill. Rev. Stat. 1979, ch. 120, par. 451) and being apprehensive that this would

terminate the proceedings in favor of the Department, took the voluntary dismissal. Moody, *contra*, has insisted that it dismissed because it was unsure of its remedy. The statute creating the Board had become effective only on January 1, 1980, and on its face appeared to add yet another tier to the administrative procedure. Moody therefore withdrew its administrative review in the circuit court after filing a petition with the Board.

Eventually the Board declined jurisdiction and on May 15, 1981, Moody again filed a complaint for administrative review in the circuit court of Sangamon County. This was done pursuant to section 24 of the Limitations Act (Ill. Rev. Stat. 1979, ch. 83, par. 24a). As is more fully explained below, we hold that Moody had the right of voluntary dismissal and refiling within one year. Therefore, the reasons become immaterial, as does the question of the jurisdiction of the Board.

The Department moved to dismiss because the complaint was not filed within 35 days of the order of February 11, 1980, as required by section 4 of the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 267). The trial court denied the motion and entered judgment with a brief docket entry as follows:

> "The Complaint for Administrative Review is allowed. The Court finds that the Department's finding of facts are against the manifest weight of the evidence and the publication of Plaintiff is exempt from taxation as being a newspaper. Cause dismissed. Cause stricken."

The parties have argued a number of procedural issues. As has been indicated, Moody dismissed its first complaint pursuant to section 52(1) of the Civil Practice Act, which provides in part as follows:

> "The plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or his attorney, and upon payment of costs, dismiss his action or any part thereof as to any defendant, without prejudice, by order filed in the cause. Thereafter he may dismiss, only on terms fixed by the court * * *." Ill. Rev. Stat. 1979, ch. 110, par. 52(1).

The Department argues that since it had filed a motion to dismiss this petition, a "hearing" had started and therefore Moody was not at liberty to dismiss voluntarily. The contention is without merit. (See *LaBarge, Inc. v. Corn Belt Bank* (1981), 101 Ill. App. 3d 741, 428 N.E.2d 711.) There had been no hearing on the motion, a fact admitted by the parties.

The second, or 1981, complaint for administrative review was filed pursuant to section 24 of the Limitations Act, which provides in part:

"In the actions specified in this Act or any other act or contract where the time for commencing an action is limited, if judgment is entered for the plaintiff but reversed on appeal, or if there is a verdict for the plaintiff and, upon a motion in arrest of judgment, the judgment is entered against the plaintiff, *or the action is voluntarily dismissed by the plaintiff*, or the action is dismissed for want of prosecution, \*\*\* then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff, \*\*\* may commence a new action within one year or within the remaining period of limitation, whichever is greater \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 83, par. 24a.

The Department argues that section 24 of the Limitations Act has no application to proceedings in administrative review, but cites no authority for that position. We disagree.

The Administrative Review Act has no provision relating to voluntary dismissals and therefore the Limitations Act does not contradict it, as might happen when a general statute, such as the Limitations Act, is sought to be applied to a specific enactment. (Compare *People ex rel. Myers v. Pennsylvania R.R. Co.* (1960), 19 Ill. 2d 122, 166 N.E.2d 86.) Furthermore, the Limitations Act is expressly designed to apply to the kind of filing deadline as is found in the Administrative Review Act.

There appears to be no prior authority relating to voluntary dismissal under the Administrative Review Act, but other operative clauses of section 24 of the Limitations Act have been applied. *Bruer v. Livingston County Board* (1978), 66 Ill. App. 3d 938, 383 N.E.2d 1016 (plaintiff allowed to refile after involuntary dismissal because of want of prosecution); *O'Hare International Bank v. Zoning Board* (1976), 37 Ill. App. 3d 1037, 1038, 347 N.E.2d 440 (plaintiff allowed to refile within one year after appellate court reversed favorable judgment).

Section 24 of the Limitations Act has a broad remedial purpose. (*People ex rel. L'Minggio v. Parker* (1978), 65 Ill. App. 3d 296, 298-99, 382 N.E.2d 613, 614-15.) No good reasons appear in our judgment to single out voluntary dismissal for special treatment.

■ The next procedural problem relates to the admitted fact that Moody did not file a bond in the first administrative review proceeding as required by section 12 of ROTA. (Ill. Rev. Stat. 1979, ch. 120, par. 451.) The Department argues that, assuming *arguendo* the second complaint for administrative review was properly entertained under section 24 of the Limitations Act, the taint of failure to file a bond in the first proceeding carries over to the second. We do not agree. The fail-

ure to file a bond is a nonjurisdictional, procedural defect. *Glasco Electric Co. v. Department of Revenue* (1981), 86 Ill. 2d 346, 427 N.E.2d 90.

We know of no authority which holds that a procedural defect survives a voluntary dismissal. Section 24 of the Limitations Act refers to a "new" action commenced within one year; if an action be new, it can scarcely be said to carry with it any of the shortcomings of its predecessors. The clear implication of the statutory wording is that the parties start afresh. The Department would appear to adopt such a position in that in its motion to dismiss the second complaint, no mention is made of the failure to file a bond in the first proceeding. The motion relates principally to the 35-day limitation and asserts that the order of the Board was not the final order, but rather the "revised final assessment" of February 12, 1980.

Having held that any action concerning the Board is irrelevant, we agree that the final order was that of February 12, 1980. We do not agree that the 35-day limitation was violated. The first suit for administrative review was timely filed; there is no contention otherwise. The subsequent voluntary dismissal and refiling under the Limitations Act does not vitiate that fact. To hold otherwise would render nugatory the provisions of section 52 of the Civil Practice Act and section 24 of the Limitations Act which we have already held to be applicable to the instant case. The Department argues that this will allow taxpayers to delay by an extra year that payment of their liabilities. If so, the remedy lies with the legislature. We add, parenthetically, that this record does not disclose any extraordinary speed on the part of the Department in disposing of the rehearings; the Department also ignores the good faith deposits made by Moody.

We turn at last to the merits of the controversy: *viz.*, whether Moody's publications are exempt.

ROTA imposes a tax on persons engaged in the retail sale of tangible personal property. (Ill. Rev. Stat. 1981, ch. 120, par. 441.) An exemption is provided which relieves from taxation "[t]he purchase, employment and transfer of such personal property as news print and ink for the primary purpose of conveying news." (Ill. Rev. Stat. 1981, ch. 120, par. 440.) Under Rule 2 of ROTA promulgated by the Department, the statute has been interpreted as exempting "sales of newspapers and magazines." The Department has established the following tests for evaluating whether a publication is a newspaper or magazine:

> "There is one test which must be met and a variety of lesser tests that should be considered in determining whether a publication is a magazine and consequently not subject to Illinois sales tax. The test which must be met is that the publication

must come out periodically and must be published on more than an annual basis. This periodicity test is met whether the magazine is a weekly or a monthly or even a quarterly or semi-annual publication. Other considerations in order of diminishing importance include the following:

(1) Does the publication contain articles and items which have value to the general public rather than to a specialized class of people?

(2) Is the publication one that has the basic format of a magazine, i.e., soft cover, individual pages, indexed articles, etc.?

(3) Can the publication be subscribed to?

(4) Does the publication contain general advertising?

(5) Is the publication commonly accepted as a magazine?

An affirmative response to any of these considerations should tend to indicate the publication in question is a magazine, assuming the initial test of periodic publication is met.

Thus, a publication which had 'February, 1977, Volume 1, Number 1' printed on its cover and which came out periodically, would be a nontaxable magazine even though it has no advertising, as long as it has as its primary purpose the conveying of news. Likewise, a crossword puzzle magazine is nontaxable as a magazine even though it is published on a monthly rather than a weekly basis." Illinois Department of Revenue, Research Reference manual—ROT & Related R. 01579, at 686 (1979).

It should be noted at the outset that the question presented is one of law; there is little, if any, factual dispute between the parties. Their principal divergence is over whether the information contained in Moody's publications is transitory in nature.

We are of the opinion that the rationale of *Time, Inc. v. Hulman* (1964), 31 Ill. 2d 344, 201 N.E.2d 374, largely controls the outcome of this case. In *Time* the contention was that the statute exempted newspapers but not magazines. The supreme court delved at length into the history of the exemption and pointed out that the legislative purpose was to prevent discrimination against newspapers in favor of radio and television which also transmit information but not in tangible form. As in *Time*, the Department here relies heavily on the preamble to the statute which distinguishes information which is permanent in form, as in books, from that which is fleeting and transitory, as in newspapers. The Department claims that Moody's information is of a permanent character and thus is taxable. We not agree. It is true that some of the publications are in the form of manuals and some of the weekly and

twice-weekly reports are supplementary to the manuals, but this alone is not controlling. Most newspapers maintain a file of their editions, either in bound volumes or on microfilm, for historical purposes, but this does not detract from the fleeting or transitory character of the information contained. Much of the information contained in Moody's publications is identical with that appearing in other publications which are admittedly newspapers. Nearly all large metropolitan dailies and several national newspapers publish the results of the stock exchanges, the bond markets, the commodity markets, and other similar financial transactions.

The Department's emphasis on what it deems transitory information ignores the several other criteria mentioned in its rule. The Department further argues that much of the information contained in Moody's publications could not be transmitted by radio or television and therefore there is no discrimination. However, it is a matter of common knowledge that brokerage offices today are linked to computers and other retrieval systems which furnish instant information of the type found in Moody's publications. Such arrangements were not in existence when the statute was passed in 1961, but the concern over discrimination between electronics and print media should be no less real today. We also note that the supreme court in *Time* did not compare magazines with radio and television, but with newspapers; if it had applied the Department's analysis as urged in this case, the publications would undoubtedly have been denied exemption.

The Department has established rules and it is required to abide by them. It is precluded from being arbitrary and inconsistent in applying those rules on a case-by-case basis. Congressman Robert L. "Muley" Doughton, Chairman of the Ways and Means Committee of the United States House of Representatives during the 73d through 79th Congresses, is reputed to have said that the essence of tax policy is to obtain the greatest number of feathers with the fewest squawks from the goose. Such a policy is apparent here when by its own rule reproduced above the Department considers a crossword puzzle magazine "news," but denies that Moody's publications are the same.

The motion to take jurisdictional notice of certain documents (Sangamon County case 80-L-108) is denied. The order of the circuit court of Sangamon County is affirmed.

Affirmed.

GREEN and LEWIS, JJ., concur.